UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WM MOBILE BAY ENVIRONMENTAL CENTER, INC., | ) ) ) | |
| Plaintiff/Counter Defendant, | ) ) | |
| V. | ) ) | Civil Action No. 13-0434-KD-N |
| THE CITY OF MOBILE SOLID WASTE AUTHORITY, | ) ) ) | |
| Defendant/Counterclaimant. | ) ) | |

**ORDER**

This action is before the Court on the Plaintiff WM Mobile Bay Environmental Center, Inc.'s motion for summary judgment, memorandum and exhibits (WM Mobile) (doc. 74, 80), defendant The City of Mobile Solid Waste Authority's (SWA) response in opposition and exhibits (doc. 96-98) and WM Mobile's reply and exhibits (doc. 99). Upon consideration and for the reasons set forth herein, the motion is denied in part and granted in part. This action is also before the Court on the Defendant The City of Mobile Solid Waste Authority's (SWA) motion for summary judgment as to Counts I through VII (docs. 75-79), WM Mobile's response and exhibits (doc. 95), and SWA's reply (doc. 101). Upon consideration and for the reasons set forth herein, the motion is denied in part and granted in part.

I. Background

In October 1993, SWA and Transamerican Waste Industries, Inc., a predecessor to WM Mobile, entered into a Solid Waste Management Contract for landfill operations and other solid waste management operations (the Contract). (Doc. 29-1) WM Mobile now alleges that SWA breached the terms of the Contract.

WM Mobile filed its second amended complaint alleging the following causes of action:

Count I - Breach of Contract Relating to Price Adjustments for Landfill Deposits;

Count II - Breach of Contract Relating to Price Adjustments for Transfer Station;

Count III - Breach of Contract Relating to Reimbursements for Capital Expenditures Due
        to Changes in Laws and Regulations;

Count IV - Breach of Contract Relating to Reimbursements for Increased Operating
Costs Due to Changes in Laws and Regulations;

Count V - Breach of Contract Relating to Requests for Service Area Expansion;

Count VI - Breach of Warranty of Good Faith and Fair Dealing;

Count VII - Breach of Indemnification Obligation;

Count VIII - Declaratory Judgment Regarding Section 6.2 of the Contract;

Count IX - Reimbursement for Overpayment of Royalties;

Count X - Breach of Contract Relating to Exclusive Disposal Rights; and

Count XI - Declaratory Judgment Regarding Sections 1.4 and 6.6 of the Contract.

(Doc. 29)

WM Mobile seeks declaratory judgment to establish the current rates for waste disposal at the Landfill and hauling waste from the transfer station to the Landfill. WM Mobile also seeks declaratory judgment as to SWA's contract obligation to work with WM Mobile to expand the service area for the Landfill.

SWA filed an amended counterclaim for breach of contract against WM Mobile alleging that the royalties had been underpaid for 2012 and 2013. (Doc. 9)  SWA also answered the second amended complaint and set forth its affirmative defenses. (Doc. 70)

II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dep't of Children & Family Services*, 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might

affect the outcome of the case.  It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.  In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

Moreover, the applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See, e.g., Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir.2005); *Gerling Global Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir.2001). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984) (citation omitted). The Court is mindful that " '[w]hen both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.' " *Muzzy Products Corp. v. Sullivan Industries, Inc.,* 194 F.Supp.2d 1360, 1378 (N.D. Ga. 2002).

III. Facts[1]

---

[1] The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [the LLC and the Ltd as] the nonmoving party."  *Benson v. Tocco,*
(Continued)

The parties do not dispute the existence and formation of the 1993 Contract between SWA and Transamerican, a predecessor to WM Mobile,[2] for the management and operation of the Landfill and Transfer Station.  They do not dispute that WM Mobile is the assignee of all rights and responsibilities under the 1993 Contract.  However, the parties dispute the meaning and effect of several of the contract provisions.

The parties also do not dispute that in 2003, SWA entered into a Lease Agreement with Waste Away Group, Inc. (Waste Away) another Waste Management affiliate whereby Waste Away leased the Landfill from SWA for a term ending October 2038. (Doc. 77-5) The Lease was part of a bond issue by SWA in which tax-exempt bonds were issued and the proceeds were used by Waste Away to obtain new disposal cells and liner systems, improve the leachate and methane gas collection systems, and acquire equipment for the landfill.  (Doc. 77-5, Exhibit 5, Lease; Doc. 76, p. 4).

IV.  Analysis

Whether the 2003 Lease controls the financial obligations instead of the 1993 Contract.

In response to WM Mobile's motion for summary judgment as to Counts I, II, III, and IV, and in its own motion, SWA argues that the 2003 Lease Agreement between Waste Away, WM Mobile's parent company, and SWA is dispositive of all the claims relating to the financial

---

*Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997).  However, the facts on summary judgment "may not turn out to be the actual facts if the case goes to trial." *See Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir.1996).

[2] Transamerican was acquired by USA Waste in 1998.  In July 1998, USA Waste merged with Waste Management and it acquired Transamerican.  In 2002, Transamerican transferred its interest in the landfill and Contract to Chastang Landfill, Inc., a Waste Management subsidiary. Chastang changed its name to WM Mobile Bay in August 2008. (Doc. 80, p. 5-6)  WM Mobile Bay is a subsidiary of its parent company Waste Away Group, Inc., which is a subsidiary of Waste Management. (Doc. 76, p. 4)

5

relationship between the parties, because the Lease restructured the financial obligations and other terms of the 1993 Contract. (Doc. 76, p. 4; Doc. 96, p.1)  In support, SWA argues that in 2003, SWA issued tax-exempt revenue bonds in the amount of $4,175,000 for the benefit of WM Mobile and were "issued for the purpose of financing the cost of improving and equipping certain existing solid waste disposal facilities located in Mobile County (the "Bond Financed Facilities") for the benefit of" Waste Away Group and to purchase a cell construction and liner system, install and operate a methane gas system, and purchase equipment. (Doc. 76, p. 4; Doc. 77-7, Tax Certificate and Agreement § 1.2(a); Doc. 96, p. 12, 20).  The bonded "Project" was the landfill and the improvements to be constructed thereon and the Lease was entered into when the revenue bonds were issued. SWA argues that the following Lease provisions require WM Mobile to manage and operate the landfill and make improvements at its own expense:

Section 6.1 Possession and Use of Project.

(a) So long as no Lease Default exists, the Company shall be permitted to possess, use, manage, operate and enjoy the Project without hindrance on the part of the Authority, subject, however, to all the terms and conditions of this Lease Agreement.

Section 6.2 Maintenance and Other Operating Expenses.

The Company will, at its own expense, (i) cause the Project to be maintained and kept in good condition, repair and working order, (ii) cause to be made all necessary repairs, renewals, replacements, betterments and improvements to the Project as may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times, and (iii) pay all gas, electric, water, sewer and other charges for the operation, use and upkeep of the Project."

Section 6.3 Improvements, Alterations, Etc.

The Company may, at its own expense, make such changes, additions, improvements or alterations to the buildings, structures and other improvements now or hereafter located on the Site as the Company, in its sole discretion, shall determine.

Section 6.5 Company's Personal Property and Fixtures

(a) The Company may, at its own expense, install at the Project any personal property or fixtures which, in the Company's judgment, are necessary or desirable for the conduct of the business carried on by the Company at the Project. Any such personal property or fixtures which are installed at the Company's expense shall be and remain the property of the Company and may be removed by the Company at any time while no Lease Default Event exists.

(Doc. 77-5, Lease Agreement).

SWA also argues that the Lease also contains a broad indemnification and release provision as follows:

Section 9.3 Indemnification.

The Company releases the Issuer and the Trustee from, and covenants and agrees that neither the Issuer, Trustee, the Tender Agent nor the Paying Agent shall be liable for, and covenants and agrees, to the extent permitted by law, to indemnify and hold harmless the Issuer, the Trustee, the Tender Agent and the Paying Agent and their directors, officers, employees and agents from and against, any and all losses, claims, damages, liabilities or expenses, of every conceivable kind, character and nature whatsoever arising out of, resulting from or in any way connected with (1) the Project, or the conditions, occupancy, use, possession, conduct or management of, or work done in or about, or from the planning, design, acquisition, installation or construction of the Improvements or any part thereof...

(Doc. 77-5, Lease Agreement).

Based upon these provisions, SWA argues that WM Mobile Bay has assumed the costs of maintaining and operating the landfill, including all costs for betterments and improvements, (doc. 77-5, § 6.2 and 6.3) and that the Lease does not provide for WM Mobile to recover these costs by a price adjustment for disposal of waste (Counts I and II).  SWA also argues that WM Mobile Bay's claims for price adjustments and reimbursements for capital expenses and

increased operating costs[3] due to changes in laws and regulations incurred at the Landfill since

2004 (Counts III and IV), are barred by the terms of the Lease Agreement and the release

language of Section 9.3.  (Doc. 96; Doc. 76, p. 17-21)  For the proposition that the Lease clearly

contemplates a continuation of the Contract for the <u>operation</u> of the landfill, but not the financial

obligations, SWA relies upon the following section:

> Section 1.5 Continuing Effect of Operating Agreement. The Company [Waste
> Away] and the Issuer [SWA] hereby acknowledge that the Operating Agreement
> continues to be in effect and that the Operating Agreement shall continue to be in
> effect after the date hereof until such time as the Operating Agreement is
> terminated in accordance with its terms. The Company and the Issuer hereby
> agree that, to the extent that the terms of this Agreement and the Operating
> Agreement conflict with respect to the operation of the Existing Facility by the
> Company or an affiliate thereof, the terms of the Operating Agreement shall
> control.

(Doc. 77-5, p. 7) (Bracketed text added).

WM Mobile argues that the Lease has no bearing on this litigation. WM Mobile points

out that it is not a party to the Lease. WM Mobile also argues that the Contract provides that it

"may be modified, amended, discharged or waived only by an agreement in writing signed by

each party" (doc. 29-1, § 7.3), but there is no such agreement and no clear expression in the

Lease that it was intended to modify or amend the Contract.  (Doc. 95, p. 3)

WM Mobile points to Section 1.5 of the Lease to argue that it specifically provides that

the Contract shall remain in full force and effect and governs conflicts between the two

documents.  WM Mobile argues that the language "with respect to the operation of the Existing

Facility", which SWA argues limits the original Contract, is not a clear statement of intent to

---

[3]   SWA argues that pursuant to Section 6.2 and 6.3 of the Lease, the costs of installation,
expansion and operation of the gas management system and the costs of pretreatment leachate
required by the Mobile Areas Water and Sewer System, the costs are the sole responsibility of
WM Mobile. (Doc. 96, p. 18-19).

8

modify or amend the compensation provision and without clear intent in writing, there can be no modification.

WM Mobile argues that the fundamental determination is the intent of the parties, and that the Court must, if possible ascertain and give effect to the common intention of the parties, and to do so, the Court may accept parol evidence to determine the intention if the contract provision is ambiguous.  WM Mobile argues that none of SWA's witnesses have testified to this interpretation and that the parties' conduct and course of dealings subsequent to the execution of the Lease in 2003 demonstrates the parties intent for financial provision of the original Contract to remain in full force and effect.

WM Mobile also points out that in 2004, the parties negotiated and agreed to a temporary rate increase pursuant to Section 6.6, captioned "Price Adjustments", to the Contract, and that SWA never made any suggestion that this Section had been superseded by the 2003 Lease. (Doc. 95, p. 6)  WM Mobile also points out that it continued to invoice the City for disposal and transfer fees as provided in the 1993 Contract and the City paid the invoices without argument that the Lease superseded the Contract. WM Mobile also continued to make royalty payment to SWA, which SWA accepted without argument that the 2003 Lease superseded the 1993 Contract.

Under Alabama law, "the circumstances surrounding the contract are considered only where the terms are ambiguous" and the Court need "not consider evidence of the parties' intentions or course of dealing" unless there is an ambiguity. *Reeves Cedarhurst Development Corp. v. First Amfed Corp.* 607 So.2d 184, 187 (Ala. 1992).  Therefore, the Court looks to whether Section 1.5 of the Lease is ambiguous.  In that regard, "[w]hether a contract is ambiguous is a question of law for the trial court to determine. In interpreting a contract, the

words of the agreement will be given their ordinary meaning. An instrument is unambiguous if only one reasonable meaning clearly emerges. If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment. However, if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury." *McLemore v. Hyundai Motor Mfg. Alabama LLC,* 7 So. 3d 318, 327 (Ala. 2008) (quoting *Reeves Cedarhurst Development Corp.*, 607 So.2d at 186-187)(internal citations and quotation marks omitted).

The Court finds that Section 1.5 of the 2003 Lease clearly indicates that the Lease agreement does not supplant the Operating Agreement.  Moreover, the phrase "with respect to the operation of the Existing Facility"  on which SWA relies to argue that the financial obligations were supplanted by the Lease, is not ambiguous.  This phrase can not be reasonably construed as a limitation on the supremacy of the 1993 Operating agreement. Giving the word "operation" its common meaning in the business context, it include financial obligations; to operate a business includes earning revenue and paying expenses. And were it ambiguous, the parties' conduct of negotiating a temporary price increase in 2004 after the Lease was entered into in 2003, continuing to assess a disposal and hauling fee, and making and receiving royalty payments is sufficient parol evidence of the parties' intent that the 1993 Contract continued in full force and effect even to the financial obligations even after the 2003 Lease was executed. Additionally, under Alabama law, an inequity "would result if a party were allowed to simultaneously claim the benefits of a contract while repudiating its burdens and conditions" *MTA, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 So. 3d 27, 31 (Ala. 2012) (recognizing an equitable estoppel exception). Accordingly, the Court finds that the Lease

provisions do not supplant the 1993 Contract provisions.  Therefore, to the extent that SWA's

motion for summary judgment is based upon this argument, the motion is denied.

Counts I, II, III and IV and Count XI for Declaratory judgment regarding Section 6.6 of
the Contract

In Count I, WM Mobile alleges that SWA breached its contractual duty to negotiate in

good faith in response to WM Mobile's requests for price adjustments for landfill deposits in

2010, 2011, 2012, 2013.  In Count II, WM Mobile alleges that SWA breached its contractual

duty to negotiate in good faith in response to WM Mobile's requests for price adjustments for

transferring and hauling waste from the transfer station to the landfill. In Count III, WM Mobile

alleges that SWA breached its contractual duty to negotiate in good faith in response to WM

Mobile's requests for reimbursements for capital expenditures. In Count IV, WM Mobile alleges

that SWA breached its contractual duty to reimburse WM Mobile for increased costs due to

changes in laws and regulation.[4]  In Count XI, WM Mobile seeks a declaratory judgment that

WM Mobile is entitled to rate increases and reimbursements and that SWA is obligated to

negotiate in good faith in response to WM Mobile's requests.

Section 6.6 of the Contract sets forth as follows:

6.6 Price Adjustments. The Contractor and the Authority recognize that during the
life of this Contract many circumstances may arise which cannot be predicted or
foreseen. It is the intent of this Section to set forth reasonable expectations as to
the items which could produce these circumstances, and to provide a means of
arriving at adjustments in Payments or compensation hereunder to Contractor to
reflect the resulting cost impacts.

Except as otherwise provided herein, the per ton fees payable to Contractor shall

---

[4]  WM Mobile points out that this provision is mandatory, stating that SWA "shall
reimburse" WM Mobile "for any increases in [] costs due to laws, rules, regulations, or
ordinances that become effective or have different interpretations after the date this Contract is
entered into and that have an adverse impact on" WM Mobile." (Doc. 29-1, Section 6.6)

not be adjusted during the first two Contract Years. Each Contract Year thereafter, such fees shall, at the request of Contractor, be adjusted to reflect the change in the cost of Contractor doing business hereunder in an amount to be mutually agreed upon by Contractor and the Authority, not to exceed the change in the Consumer Price Index, or the Competitive Price Index, whichever is the lowest.

Said negotiations may include, but not necessarily be limited to, the following situations:

> (i) compensation to Contractor for the design and/or construction of on-site betterments;
> (ii) material changes in tonnage delivered to the Landfill or the Transfer Station;
> (iii) changes in labor and/or equipment requirements or rates;
> (iv) unexpected cost changes by Contractor.

The adjusted proposal price resulting from said negotiations shall include compensation for all labor, equipment and materials necessary to perform this Contract as may be amended by said negotiations.

Notwithstanding any provision in this Contract to the contrary, the Authority shall reimburse Contractor for any increases in Contractor's costs due to laws, rules, regulations or ordinances that become effective or have different interpretations after the date this Contract is entered into and that have an adverse impact on Contractor hereunder. Furthermore, in the event that Contractor incurs any material increase in costs as a result of events which it could not reasonably foresee which arise after the date this Contract is entered into and which are beyond the reasonable control of the Contractor (including price increases, operating cost increases, reductions in revenue expectations, reduction in volume of the Mobile Waste Stream deposited at the Landfill below the represented figures in the RFP, equipment or repair costs or other similar items), such that either Contractor's purpose in entering into this Contract shall be frustrated or its performance hereunder or its financial expectations from this Contract would be adversely affected, there shall be an immediate equitable adjustment of the rates and/or other compensation ("Equitable Rate Adjustment") paid under this Contract by the Authority to the Contractor so as to compensate Contractor for such increased costs, in the manner as shall otherwise be provided herein.

The Authority shall reimburse the Contractor for any surcharge, fee, city, tax or other charges imposed by federal, state or local government or any agency thereof, for the purpose of funding solid waste management programs. Such items shall be cause for an automatic, and immediate rate adjustment in the amount of such fee, duty, tax or charge.

In addition to the above, either Contractor or the Authority shall be allowed to

12

initiate actions and to agree to rate adjustments hereunder that would result from the implementation of methods, processes or other technology for the benefit of the environment, the public and/or the community and that were not contemplated hereunder.

For such adjustments, Contractor shall petition the Authority prior to any such adjustment and shall be responsible for documenting, to the Authority's reasonable satisfaction, the cause for the adjustment and the Authority shall render a decision within 30 days after the Contractor has provided such documentation. Contractor shall give reasonable notice to Haulers of rate increases hereunder.

The cost of fines or penalties imposed for violations by Contractor of Permit conditions, laws or regulations shall not be considered as cause for a rate adjustment.

The Authority and the Contractor may, prior to the first day of October of each Contract year, negotiate adjustments in the Payment Rate and any other provision of the Contract

(Doc. 29-1, p. 25-26).

Under Alabama law, " '[t]he elements of a breach-of-contract claim … are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.' " *Smith v. Cotton States Mut. Ins. Co.,* - - - So. 3d - - - , 2014 WL 1407301, *4  (Ala. Civ. App. Apr, 11, 2014) (quoting *Shaffer v. Regions Fin. Corp.,* 29 So.3d 872, 880 (Ala.2009) (quoting *Reynolds Metals Co. v. Hill,* 825 So.2d 100, 105 (Ala.2002)).  The parties do not dispute the validity of the Contract or of this Contract provision.

On motion for summary judgment, WM Mobile alleges that it made specific requests for price adjustments and reimbursements and attended meeting in an effort to provide information to support the requests, during the Contract years in September 2010, October 2010, November 2011, December 2011, September 2012, November 2012, and August 2013. (Doc. 80, p. 13-16; Doc. 95, p. 12-15)  And that as to each request, SWA either did not respond, or took no action, or asked for additional information and then took no action on the additional information provided.

(Id.)  WM Mobile acknowledges that the Contract contains a provision that the rate adjustment must be "mutually agreed upon" by the parties and documented to SWA's "reasonable satisfaction", but argues that "it is impossible for parties to mutually agree upon anything when one side refuses to negotiate in good faith as required by the Contract" and that SWA has demonstrated through it conduct and testimony that it does not intend to abide by this contractual obligation.  (Doc. 99, p. 13).

In response, SWA alleges that WM Mobile failed to provide appropriate "supporting documentation" for its requests, which documentation was "repeatedly and consistently requested by members" of SWA, and therefore, WM Mobile failed to follow the requirements of the Contract.  (Doc. 96, p. 7)  SWA also alleges that the documentation submitted on motion for summary judgment in support of WM Mobile's claim to entitlement for rate adjustments "are nothing more than arithmetic"[5] and are not documentation "to the Authority's reasonable satisfaction" as required in the Contract and are not commercially reasonable.[6]

Upon consideration of the factual allegations regarding the requests for price adjustments and reimbursements from September 2010 through August 2013 and the documentation provided with the requests, the Court finds that there is a genuine issue of material fact on the claims of breach of contract.  Specifically, there is a factual issue as to whether SWA failed to negotiate the price adjustments and reimbursements claimed in Counts I through IV and whether WM Mobile provided sufficient documentation from which SWA could find to its reasonable

---

[5]  At present, WM Mobile's expert witness is subject to a motion to exclude his testimony.  *See* footnote 9.

[6]  SWA points out that in 2005 a price adjustment was negotiated for the purpose of reimbursing WM Mobile for expenditures and the adjustment was in effect from 2005 through 2009.  (Doc. 96, p. 11-12)

satisfaction that an adjustment or reimbursement was due.  Accordingly, summary judgment is denied as to Counts I through IV.[7]  Because resolution of the breach of contract claims will guide the Court's decision as to whether declaratory judgment should be entered, WM Mobile's motion for summary judgment seeking declaratory judgment in Count XI is DENIED.


<u>Count V – Breach of Contract Relating to Requests for Service Area Expansion and Count XI seeking Declaratory Judgment as to Section 1.4</u>

In Count V, WM Mobile alleges that SWA has breached the Contract because it has failed to work with WM Mobile to expand the service area for the landfill, even though it has demonstrated the benefits of expansion.  In Count XI, WM Mobile seeks a declaratory judgment that SWA is contractually obligated to work with WM Mobile to expand the Service Area. (Doc. 29)

In the Contract, Section 1.4 defines the service area as the City of Mobile and the unincorporated areas of Mobile County, Alabama, "including all municipalities therein, who elect to use the Landfill". (Doc. 29-1, p. 4, Definitions)  Section 1.4 also contains the following provision:

> However, the Authority will work with the Contractor to expand the Service Area if doing so is deemed by the Authority to be beneficial to the citizens of the City. Change of the Service Area shall be subject to approval of the Authority and the Governing Body of the City of Mobile.

(Id.)

At SWA's request in December 2011, WM Mobile provided information to SWA that demonstrated that the expansion was beneficial to the citizens of Mobile by increasing revenues

---

[7] SWA's defense of statute of limitation on MW's claim of rate increases is carried to trial.

to SWA without increasing any cost and that expansion would have no detrimental effect on the long-term viability of the landfill. (Doc. 80, p. 15-16)   SWA did not take any official action or respond to this request. (Id. p. 18)

In September 2012, WM Mobile again requested expansion for the above reasons and because the Turkey Trot landfill in Washington County was competing with WM Mobile in Mobile County.  (Doc. 80, p. 19)  According to WM, SWA did not take any official action or respond, nor did SWA respond to WM Mobile's follow-up letter in November 2012 and after further communication in July and August 2013, SWA did not take any action on the request for Service Area expansion. (Doc. 80, p. 22)

Under Alabama law, the "host community", the Mobile County Commission, must develop a solid waste management plan and approve any expansion of service area to allow solid waste from outside of the County for disposal at the Landfill. (Doc. 79, p. 11; Ala. Code § 22-27-47 and 48)  WM Mobile and SWA were both aware of this requirement. Waste Management employee Rene Feucheux acknowledged that the host community would have to approve the expansion (Doc. 78-8, p. 35).  John Bell, an employee of the City of Mobile who acted as an advisor to the SWA, testified that he advised SWA that expansion would benefit the citizens of Mobile and that SWA deemed the expansion would be beneficial. (Doc. 80-4, p. 32-34).

SWA Board member Timothy Morris provided an affidavit and copies of minutes of meetings where he states that SWA "has always supported such an expansion and has always made this known to Waste Management" but "[u]nless and until the County Commission granted Host Community approval, any action of the Authority would be meaningless." (Doc. 78-1, p. 5) Morris references the minutes of meetings in July 2003, October 2005, December 2006, February 2008, August 2008, November 2011, which reflect discussions of expansion, the need

for Host Community approval, and the lack of approval by Mobile County. (Id., p. 12-13)

Morris also stated that Waste Management had not applied to the Mobile County Commission or

had any discussion with the City Council since 2003. (Id., p. 14) (citing Faucheux's Deposition,

Doc. 78-8, p. 36-37).

   SWA argues that it has always supported an expansion, and will continue to do so in the

future, but under Alabama law, the Host Community, the Mobile County Commission, must

approve the expansion by amending it solid waste management plan and that the Alabama

Department of Environmental Management must issue a permit modification for such an

expansion, but only after Host Community approval.  SWA argues that in view of these facts, it

cannot be held in breach of its contractual obligation to "work with" WM Mobile. (Doc. 76, p.

30-31; Doc. 101, p. 10).

   WM Mobile argues that SWA's motion should be denied because the Contract places an

obligation on SWA to assist with efforts to expand, and despite repeated requests, SWA has

never demonstrated through official action that it approves of the expansion (doc. 95, p. 21).

WM Mobile also argues that summary judgment should be entered in its favor "declaring that

SWA must officially approve Service Area expansion into the following counties in Alabama:

Baldwin, Washington, Clarke, Choctaw, Monroe, Escambia, Conecuh, Covington and Butler,

which is consistent with WM Mobile Bay's requests." WM Mobile argues that an actual

controversy exists between the parties as to SWA's obligation to work with WM Mobile Bay to

expand the service areas and that SWA has "never demonstrated through official action that it

approves of WM Mobile Bay's requests."  (Doc. 80, p. 45-46)

   In addition to the 28 U.S.C. § 2201, which provides that in a "case of actual controversy",

the Court "may declare the rights and other legal relations of any interested party", WM

Mobile's allegation seeking declaratory judgment is also based on Ala. Code § 6-6-223, captioned, "Construction or validity of instruments, statutes, ordinances, contracts, or franchises", which sets forth as follows:

> Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Ala. Code § 6-6-223.

As previously stated, under Alabama law, " '[t]he elements of a breach-of-contract claim … are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.' " *Smith v. Cotton States Mut. Ins. Co.,* - - - So. 3d - - - , 2014 WL 1407301, *4  (Ala. Civ. App. Apr, 11, 2014) (quoting *Shaffer v. Regions Fin. Corp.,* 29 So.3d 872, 880 (Ala.2009) (quoting *Reynolds Metals Co. v. Hill,* 825 So.2d 100, 105 (Ala.2002)).  The parties do not dispute the validity of the Contract or of this Contract provision.  SWA does not argue that WM Mobile has failed to perform as to this specific Contract Provision.

Thus the Court looks to whether there is evidence from which a reasonable jury could determine that that SWA has not performed under the Contract provision to "work with" WM Mobile.  However, WM Mobile has not presented any evidence as to what sort of "official action" would demonstrate approval and has not provided the Court with any guidance in the law as to that issue.  But WM Mobile has submitted a copy of a letter written to the SWA Board explaining that it had requested the SWA to cooperate in good faith to expand the service area but the SWA had provided no relief on this request. (Doc. 95-6, p. 21, Letter of September 27, 2012).  WM Mobile also provides a copy of a letter wherein WM Mobile reiterates that at the

October 2012 meeting, SWA had questions regarding the previous requests for service area

expansion and tabled other issues until these questions were resolved. (Doc. 95-6, p. 25)  WM

Mobile reminded SWA that it had not received a reply and that the anniversary date of the

amended request for service area expansion was approaching.  WM Mobile also provided a

summary of the history of the service area expansion requests, including delays of up to three

years to respond on the part of SWA. (Doc. 95-6, p. 25-26).

SWA presented evidence that at the Board meetings when the issue of expansion has

been addressed, the Board of SWA has approved the expansion.  The minutes from the August

2008 Board Meeting reflect as follows:

> County Landfill Discussion/Committee.  The Landfill in Washington County
> will be direct competition with Waste Management/Chastang.  The expansion
> has been voted on by the board, this is all the board can do, up to the City to
> approve.  The City is taking more interest in this now.  Committee to review the
> options, what is best to serve the City of Mobile.  Committee shall consist of:
> Ray Richardson, Tim Morris and Keith Wise.  Mr. Morris is of the opinion that
> the City and County should be together.

(Doc. 78-1, p. 52).  The minutes also reflect that Donna Davis of Waste Management introduced

the regional manager, manager of local hauling, local manager at Chastang, and the attorney for

Waste Management, who were present at the meeting. (Id. p. 51).

At the next meeting on November 10, 2011, the minutes reflect that the SWA Board had

not met since August 2008 and that:

> It was discussed that the board approved the service area expansion and that no
> other decisions were made by the City Council or the County Commission for the
> expansion so that the authority could move forward with the plan.

(Doc. 78-1, p. 55).  Thus, the evidence establish that SWA officially approved the expansion on

two occasions, but that the expansion efforts were thwarted by the City's and County's inaction.

The terms of the Operating agreement cannot be reasonably construed to hold SWA liable for the

City's or County's inaction on expansion efforts.  Accordingly, SWA's motion for summary judgment as to Count V is GRANTED,  and WM Mobile's motion for summary judgment seeking declaratory judgment regarding the expansion is DENIED.


   <u>Count VI - Breach of warranty of good faith and fair dealing</u>

  In Count VI, WM Mobile alleges that SWA breach its contractual duty to perform its obligations consistent with standards of good faith and fair dealing because it failed to negotiate price adjustments resulting from increased costs of managing the landfill (Count I), failed to negotiate price adjustments resulting from increased costs of operating the transfer station and hauling waste from the station to the landfill (Count II), failed to negotiate reimbursements for capital expenditures (Count III), refusing to reimburse WM Mobile for increased costs resulting from changes in laws and regulations (Count  IV), and for refusing to work with WM Mobile for expansion of its service area (Count V).

   The Contract contains the following provision:

  1.31 <u>Covenant of Good Faith and Fair Dealing.</u>

  The parties to this Contract mutually covenant to perform all of their obligations hereunder, to exercise all discretion and rights granted hereunder, and to give all consents in a reasonable manner consistent with the standards of "good faith" and "fair dealing."

(Doc. 29-1, p. 16)

  In response to WM Mobile's motion and in its own motion, SWA argues that Alabama law does not recognize a cause of action for breach of the duty of good faith and fair dealing and therefore, Count VI should be dismissed.   SWA points out that WM Mobile failed to cite any Alabama case law to support this cause of action but instead cites to out of state authority.

This Court sits in diversity and must apply the substantive laws of the forum state, Alabama. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 823 (1938). To do so, this court "must decide the case the way it appears the state's highest court would." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir.2001) (internal quotation marks omitted). In *Tanner v. Church's Fried Chicken, Inc.,* 582 So.2d 449, 452 (Ala. 1991), the Alabama Supreme Court held that

> This Court has clearly and specifically held that a duty of good faith in connection with a contract is directive, not remedial, and that therefore an action will not lie for breach of such a duty. The directive nature of the duty is in no way related to the fact that it is implied rather than expressed.

*Tanner,* 582 So.2d at 451-452 (citation omitted)

The Court found that Tanner could not maintain an action for breach of duty of good faith based upon an express contract provision to that effect in a purchase agreement. Accordingly, WM Mobile cannot maintain an action based upon the express provision in the 1993 Contract. Therefore, SWA is entitled to summary judgment in its favor as to Count VI and that Count is dismissed.

However, the *Tanner* court further held that

> Because we hold that there is no remedy for breach of an express promise in a contract to "act in good faith," we do not address whether there is substantial evidence in the record to support the plaintiffs' claim. Therefore, based on the facts of the present case, we hold that in order to prove a breach of the purchase agreement on the part of Church's, the plaintiffs must prove that Church's expressly breached some other specific term of the purchase agreement.

*Id*., at 453.

WM Mobile has alleged that SWA "expressly breached some other specific term" of the Contract, *i.e.,* Counts I through V, as identified in Count VI. Therefore, the Court will separately address the parties' respective arguments as to these Counts.

Count VII – Breach of Indemnification Obligation

In Count VII, WM Mobile alleges that SWA has breached its contractual obligation to indemnify and hold harmless WM Mobile from liability, loss, costs, and expenses arising from conditions that existed at the landfill before the commencement date of the Contract, October 9, 1993.  WM Mobile alleges that certain contamination at the landfill relates to periods before the commencement date and that it is entitled to reimbursement for all expenses incurred in connection with the contamination in the amount of $23,064.50.  Specifically, WM Mobile argues that it is contractually entitled to reimbursement for installation of groundwater monitoring wells in 2008 and 2013, for semi-annual costs for sampling and analysis of the groundwater at the unlined old portion of the landfill and for costs incurred for an Alternate Source Determination and a Nature and Extent Determination. (Doc. 80, p. 23-24, 38-39; Doc. 95, p. 19-20)  In support, WM Mobile provides the affidavit of Mark Noel, an Environmental Manager with Waste Management. (Doc. 80-10)  Noel states that "[a]s a result of the fact that the old landfill is unlined, a condition that existed prior to the Commencement Date of the . . .Contract", WM Mobile installed the wells and incurred these expenses. (Id.)[8]

SWA argues that WM Mobile never made a pre-suit demand or claim for reimbursement or indemnification.  SWA asserts that despite its request for production of "[a]ll documents

_____

[8]  WM Mobile also asserts that these expenses are reasonable and relies upon the opinion of its expert witness William J. Gaffigan. (Doc. 80-11, Affidavit)  Gaffigan stated that the expenses were "reasonable based on the review of expenditures required for the installation of the groundwater monitoring wells and sampling and analysis of the groundwater from the unlined landfill." (Id., p. 4)  SWA filed a motion to exclude Gaffigan's testimony. (Doc. 112)  However, SWA did not address this opinion in its response to WM Mobile's argument that it is entitled to reimbursement for these expenses.

provided" to SWA to support this claim or production of "any claim or demand" for indemnification, WM Mobile never produced any documents during discovery, but instead stated that it was "currently researching this issue and will produce responsive documents as they are located." (Doc. 76, p. 29)  SWA points out that after discovery closed and in support of its summary judgment motion, WM Mobile provided Noel's affidavit and copies of invoices. (Doc. 76, p. 28-29; Doc. 96, p. 20-22)

SWA also argues that the record evidence shows that no contamination existed at the landfill before the commencement date of the 1993 Contract.  For this position, SWA relies on WM Mobile's Area Engineer and 30(b)(6) designee Brian Dohilite who testified that "only 'minor things' like grass cutting and routine maintenance have been undertaken with regard to the [old landfill] that existed prior to the commencement date" of the Contract in 1993. (Doc. 76, p. 29)

The Contract includes the following relevant provision concerning SWA's indemnification obligations:

> 1.12 <u>Hold Harmless Clause</u>.  . . .
>
> Notwithstanding any provision herein to the contrary, the City and the Authority agree at all times to indemnify and save the Contractor … free and harmless from any and all liability, claim of liability, loss, claim of loss, any and all suits, actions, legal proceedings, claims, demands, damages, costs, orders (including consent and cleanup orders) and expenses (including engineering and attorney fees), which may arise from conditions that existed at the Landfill or the Transfer Station as of or relating to periods prior to the Commencement Date or that are attributable to actions of the Authority, the City or the Contract Administrator, including the Authority's and the City's obligation to obtain all Permits, orders and licenses required to be in place at the Landfill and Transfer Station as of the Commencement Date. . . .

(Doc. 29-1, p. 9, Section 1.12.)

Thus, pursuant to the terms of the Contract, SWA has a duty to indemnify WM Mobile

for costs arising from "conditions that existed" prior to the commencement date. In that regard, WM Mobile's Environmental Manager Noel states that "[a]s a result of the fact that the old landfill is unlined, a condition that existed prior to the Commencement Date of the . . .Contract", WM Mobile incurred the expenses. (Id.)

There is no dispute of fact that the old landfill was unlined before 1993.  SWA points to Dohilite's testimony that only grass cutting and routine maintenance were undertaken with regard to the old landfill "that existed prior to" the commencement date as evidence that there was no groundwater contamination resulting from the unlined landfill.  However, Dohilite testified that between 1998-1999, when the old landfill area was closed, and 2005, the grass was cut and erosion and drainage issues were fixed. (Doc. 78-11, p. 23-24) [9]  Dohilite did not testify as to conditions existing before the commencement date of the Contract in 1993 nor does his testimony dispute the fact that groundwater monitoring wells were placed on the site in 2008 and 2013.   His testimony does not rebut Noel's testimony that the old landfill was unlined, that that was a condition that existed prior to the commencement date of the Contract, that the wells were installed and monitoring expenses were incurred, or that the costs of monitoring groundwater contamination arose from that pre-existing condition, an unlined landfill.

However, SWA argues that WM Mobile never made a demand or claim for payment prior to filing suit.  In support, SWA points out that WM Mobile did not disclose in discovery any documents that it had "provided to" SWA in support of its claim, but instead, relies on Noel's post-litigation affidavit and copies of invoices.  Thus, it appears that SWA argues that it was never given a chance to perform under the Contract because WM Mobile never made a

---

[9]  Dohilite testified that in 1999-2000, a soil cover was place over the old landfill and then in 2005-2006, a liner was placed on top so that the area could be used to place additional garbage. (Doc. 76-11, p. 23-24)

claim for reimbursement. However, SWA does not argue that the groundwater contamination was not the result of the unlined landfill, the pre-existing condition, nor does it point the Court to any provision in the Contract that requires notice or demand before litigation.

Under Alabama law "a promisor is held strictly to the literal terms of his promise." *Alpine Const. Co. v. Water Works Bd. of City of Birmingham*, 377 So.2d 954, 956 (Ala. 1979). Also, under Alabama law, "[t]he law can properly excuse a promisor from performing whenever justice requires it if the failure of performance was caused by the fault, actions, or inactions of the other party." *Rapaco, Inc. v. Agee*, 453 So.2d 1048, 1050 (Ala.Civ.App. 1984).  Arguably, had WM Mobile made a pre-litigation demand, then SWA would have had an opportunity to perform under the Contract.  However, as previously stated, there is no provision in the Contract that requires notice or demand to be given before filing suit for reimbursement and indemnification.  Further, SWA does not dispute that the expenses were incurred. (Doc. 96, p. 20-22; Doc. 76, p. 28-29)  Accordingly, summary judgment is due to be GRANTED in favor of WM Mobile as to Count VII for reimbursement and indemnification in the amount of $23,064.50.


Count VIII – Declaratory Judgment Regarding Section 6.2 and Count IX -Reimbursement for Overpayment

In Count VIII, WM Mobile alleges that in August 2013, SWA declared WM Mobile in breach as to Section 6.2 of the Contract for allegedly under-reporting the volume of waste deposited and under-paying royalties. WM Mobile alleges that there is a justiciable controversy over the interpretation of the section and that the Court may determine the construction and the parties' legal rights and obligations. (Doc. 29, p. 16)

In Count IX, WM Mobile alleges that when SWA declared the breach it also threatened to terminate the Contract unless the royalties were paid.  WM Mobile alleges that this threat constitutes economic duress and business compulsion, and for the sole purpose of preserving its contractual rights, it involuntarily paid the disputed royalties and is due to be reimbursed. (Doc. 29, p. 17)

In its counterclaim, SWA claims that WM Mobile had underpaid the royalties for the year of 2012 through the third quarter of 2013.  SWA alleges that WM Mobile reported a larger amount of waste to the Alabama Department of Environmental Management than it reported to SWA, that the intentional underreporting constitutes a material breach of the contract, and demands judgment for the amount of royalty that was underreported and underpaid. (Doc. 9)

On motion for summary judgment, WM Mobile argues Section 6.2 does not require payments of royalties to SWA for waste deposited by it or its hauling affiliates and that it mistakenly paid this royalty in the past, but then corrected its mistake. However, after accepting the royalty payments for approximately a year and a half, SWA declared WM Mobile in default, and threatened to terminate the Contract. Thus, WM Mobile paid the royalties under economic duress and business compulsion and now seeks reimbursement and declaratory judgment as to the proper calculation of royalty payments.  As to SWA's counterclaim, WM Mobile argues that summary judgment should be entered in its favor because the counterclaim is based on an incorrect interpretation of Section 6.2.

In support, WM Mobile relies upon the express language of Section 6.2 that requires a royalty on waste deposited "by the City or by third parties" and argues that Waste Management and its hauling affiliates are not "third parties" under the Section.  WM Mobile also argues that there were no "proceeds actually received" because it excluded "internal volume", waste that

comes from a Waste Management truck or subcontractor, i.*e.,* a hauling affiliate, from the calculation, and that although there is an "internal cost" billed to the hauling affiliate, no money changes hands, and the cost is used to separately track profitability.

In response, SWA argues that in the historical context, "by third parties" meant companies in the solid waste business other than Transamerican, WM Mobile's predecessor. SWA argues that it was to receive a royalty on the "entire waste stream" deposited at the landfill and that the parties' "course of dealing" for over twenty years binds WM Mobile to that interpretation of the Contract.  SWA also argues that WM Mobile is the signatory to the Contract and that it has no garbage trucks or collection stream to deposit at the landfill but instead separate corporate entities within the Waste Management corporate group or third parties with which they contract do so.  SWA argues that under Alabama law, which recognizes that corporations are separate and distinct entities, the Waste Management affiliates, are third parties to the Contract despite the presence of a parent corporation.

Section V., captioned "New Landfill Facility", provides, in relevant part, as follows:

5.3 Contractor's [WM Mobile's] Rights.  The Contractor shall have the right to dispose at the New Landfill of Solid Waste generated within the Service Area from any other parties in addition to [SWA], provided it complies with all laws, rules and regulations governing the New Landfill.

(Doc. 29, p. 23) (bracketed text added).

Section VI, captioned "Compensation", provides, in relevant part, as follows:

6.1 Payment Plan.  . . . The Contractor shall negotiate its own rates for the disposal of permitted materials from third parties at the Landfill, which rates will be prominently displayed at the Landfill, and shall receive no fees from [SWA] for such materials.

6.2 Royalty Payment.  The Contractor agrees to pay [SWA] royalties in the amount of 5% of the gross revenue received by the Contractor from all Solid Waste deposited at the Landfill by the City or by third parties during the term of this Contract.  This royalty shall be payable quarterly, based on gate proceeds, out

of proceeds actually received by Contractor.

(Doc. 29, p. 24) (bracketed text added).

In addition to the 28 U.S.C. § 2201, which provides that in a "case of actual controversy", the Court "may declare the rights and other legal relations of any interested party", WM Mobile's allegation seeking declaratory judgment is also based on Ala. Code § 6-6-223, captioned, "Construction or validity of instruments, statutes, ordinances, contracts, or franchises", which sets forth as follows:

> Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Ala. Code § 6-6-223.

Under Alabama law, the "course of dealing is 'relevant not only to the interpretation of express contract terms, but may [itself] constitute contract terms.' . . . [I]it "may not only supplement or qualify express terms, but in appropriate circumstances, may even *override* express terms." *Marshall Durbin Farms, Inc. v. Fuller,* 794 So.2d 320, 325 (Ala. 2000) (citations omitted); *see also City of Huntsville v. Stove House 5, Inc*., 3 So.3d 186, 193 (Ala. 2008) ("This Court recognizes that '[a]n implied contract arises where there are circumstances which, according to the ordinary course of dealing and common understanding, show a mutual intent to contract ....'") However, under Alabama law, "the circumstances surrounding the contract are considered only where the terms are ambiguous" and the Court need "not consider evidence of the parties' intentions or course of dealing" unless there is an ambiguity. *Reeves Cedarhurst Development Corp. v. First Amfed Corp.* 607 So.2d 184, 187 (Ala. 1992).

Therefore, the Court looks to whether Section 6.2 is ambiguous. In that regard,

"[w]hether a contract is ambiguous is a question of law for the trial court to determine. In interpreting a contract, the words of the agreement will be given their ordinary meaning. An instrument is unambiguous if only one reasonable meaning clearly emerges. If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment. However, if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury." *McLemore v. Hyundai Motor Mfg. Alabama LLC,* 7 So. 3d 318, 327 (Ala. 2008) (quoting *Reeves Cedarhurst Development Corp.*, 607 So.2d at 186-187)(internal citations and quotation marks omitted).

The Court finds that the phrase "deposited . . . by third parties" is not ambiguous.  Giving the term its ordinary meaning, "third parties" means "third parties" to the Contract. The Contract specifically states WM Mobile has the "right to dispose … Solid Waste generated within the Service Area from any other parties in addition to" SWA.   Since WM Mobile and SWA are the only parties to the Contract, Waste Management and its subsidiary corporations are third parties as contemplated in the Contract.  Once the Court has determined that there is no ambiguity, "it must determine the force and effect of the terms of the contract as a matter of law." *Mclemore*, 7 So. 3d at 327.  Accordingly, the force and effect of Section 6.2 is that WM Mobile owes royalties on the solid waste deposited by Waste Management and its affiliates, and therefore, WM Mobile is not entitled to summary judgment in its favor as to Count VIII or Count IX.

Count X – Breach of Contract relating to exclusive disposal rights

In Count X, WM Mobile alleges that SWA breached the Contract because it directed certain solid wastes to a separate disposal facility and deprived WM Mobile of the revenue had

the waste been disposed at the landfill.   Specifically, WM Mobile alleges that 579,053 tons of trash were diverted to Dirt, Inc., between January 2005 and April 2013 and applying the contract disposal rate "yields lost revenues of $12,139,841, after subtracting the 5% royalty" due on the revenue.  (Doc. 80, p. 28, 39-40)  WM Mobile argues that SWA has admitted that it has not fulfilled this contractual obligation.  (Id. p. 40)

In response, SWA argues that at the time of the Contract, the City of Mobile had its own trashfill for household yard waste and construction and demolition waste, thus the 1993 Contract did not apply to this type of trash, but instead to household garbage. In support, SWA argues that two years after the Contract, Transamerican submitted a written proposal to receive this type of waste at a different landfill in Semmes, Alabama, and that had it been Tranamerican's "intent to capture this waste stream as a matter of right", it would have no reason to separately negotiate or submit a separate proposal.   SWA argues that the course of dealing supports the conclusion that the parties did not intend for WM Mobile to have exclusive disposal rights to all solid waste collected by the City.

WM Mobile replies that the proposal to receive the City's household yard waste and construction and demolition waste at the landfill in Semmes, was in response to John Bell's request for a proposal to have the waste delivered there in lieu of the Chastang landfill, at a savings to the City.  WM Mobile asserts that no agreement was reached and the City remained obligated to dispose at the Chastang landfill under the 1993 Contract.

The Contract contains the following provision:

5.2 Authority's Responsibility. The Authority agrees to assist the Contractor in obtaining any and all permits, licenses, and approvals necessary to open and operate the New Landfill and, once the New Landfill has been opened, to dispose at the New Landfill of all the City of Mobile Solid Waste generated within the Service Area.

(Doc. 29-1, Section 5.2.)

      1.32 <u>Mobile Solid Waste Stream.</u>  . . . During the term hereof, the Authority agrees to have delivered all Mobile Solid Waste Stream only to the Landfill or the Transfer Station and to no other sites, for disposal by Contractor.

(Id., Section 1.32)

      "Mobile Solid Waste" is defined as

      All non-infectious industrial, commercial, residential and municipal or other Solid Waste that is generated within the Service Area, excluding waste that by law or regulation cannot be disposed of at a sanitary landfill. This term also excludes Hazardous Waste.

(Id., p. 4).

      "Solid Waste" is defined as "All Refuse and Demolition Waste." (Id. p. 5)

      "Refuse" is defined as

      All Solid Waste, and commercial and industrial Special Waste meeting the classification of such terms as defined by ADEM or the State of Alabama, and including, with limitation; wastes such as discarded materials from dwelling places, households, apartment houses, stores, office buildings, restaurants, hotels, institutions, and all commercial and industrial establishments, including waste or discarded food, animal and vegetable matter, paper, cardboard, wood, cans, glass, ashes and boxes, cuttings from trees, lawns, and gardens, septic tank pumping and dried digested sludge grit. . . .

(Doc. 29-1, p. 5).

      "Demolition Waste" is defined as

      All debris and waste construction materials, including earth, rock, concrete, brick, plaster, plasterboard, glass, asphaltic concrete, plastics, wire and other ferrous materials derived from the construction of or the partial or total demolition of buildings, roads or other structure, and meeting the definition of unclassified wastes as defined by the regulations of ADEM or the State of Alabama.

(Doc. 29-1, p. 3-4)

      As previously stated, under Alabama law, "the circumstances surrounding the contract

are considered only where the terms are ambiguous" and the Court need "not consider evidence

of the parties' intentions or course of dealing" unless there is an ambiguity. *Reeves Cedarhurst Development Corp.,* 607 So.2d at 187.

Reading the Contract provisions together, the Court finds that there is no ambiguity and that the Contract requires that all Mobile Solid Waste be disposed of at the landfill and that Solid Waste is defined in such a manner as to include the type of waste allegedly delivered to Dirt, Inc. Once the Court has determined that there is no ambiguity, "it must determine the force and effect of the terms of the contract as a matter of law." *Mclemore*, 7 So. 3d at 327.  Accordingly, the force and effect of Section 5.2 and Section 1.32 is that SWA has breached the Contract by delivering certain City of Mobile waste to the Dirt, Inc. landfill.  Accordingly, WM Mobile is entitled to summary judgment in its favor as to Count X.  However, WM Mobile's argument is unclear as to whether the amount of damages it seeks was based upon the disposal rates in effect at the time of the misdirection of waste or upon rates based upon the requested price adjustments for the years 2010-2013.  Accordingly, the issue of damages is reserved for trial.

IV. Conclusion

In accordance with the foregoing, parties' respective motions for summary judgment are denied in part and granted in part as set forth herein.

DONE and ORDERED this the 21st day of December 2014.

s/ Kristi K. DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE